```
                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF GEORGIA
                            COLUMBUS DIVISION


EQUAL EMPLOYMENT OPPORTUNITY       *
COMMISSION,
                                   *

     Plaintiff,
                                   *
vs.                                           CASE NO. 4:23-cv-167 (CDL)
                                   *

ZOE CENTER FOR PEDIATRIC &
ADOLESCENT HEALTH, LLC,            *

     Defendant.                    *
_____
```

O R D E R

Emily Caldwell was employed by ZÖe Center for Pediatric and Adolescent Health, LLC, for just over three months. Within that time, Caldwell performed well and earned a promotion and additional job responsibilities. Before she could begin those new tasks, however, Caldwell informed ZÖe Center that she was disabled and requested a remote-work accommodation. The next day, ZÖe Center terminated her employment. The Equal Employment Opportunity Commission (the "EEOC") brought this action on behalf of Caldwell against ZÖe Center, asserting that Caldwell was denied an accommodation and terminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Presently pending before the Court is the EEOC's motion for partial summary judgment on its claims. For the following reasons, that motion (ECF No. 35) is granted in part and denied in part.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to ZÖe Center, the record reveals the following facts.

## I.  Caldwell's Mental Health Conditions

Before beginning her employment with ZÖe Center, Emily Caldwell was diagnosed with post-traumatic stress disorder ("PTSD"), major depressive disorder, generalized anxiety disorder, and attention deficit and hyperactivity disorder ("ADHD"). Caldwell received treatment for these conditions over the years through prescribed medications and regular visits with her healthcare providers, including her primary provider Dr.

Whitfield, who began treating Caldwell in 2020. Caldwell was also prescribed the use of her two pet cats as "Emotional Support Animals" to help alleviate the symptoms of her conditions. Caldwell Decl. Ex. N, Letter from Dr. John, ECF No. 35-3 at 122.

Caldwell and Dr. Whitfield both testified that Caldwell experiences "flare-up[s]" of her conditions. Caldwell Decl. ¶ 3, ECF No. 35-3; Whitfield Decl. ¶ 6, ECF No. 35-3 at 25-26. Dr. Whitfield stated that Caldwell's "flare-ups" cause Caldwell to "experience[] extreme levels of stress and anxiety, which can eventually cause multiple panic attacks per day." Whitfield Decl. ¶ 6, ECF No. 35-3 at 25. Caldwell testified that, during a flare-up, she suffers panic attacks "over a series of weeks." Caldwell Decl. ¶ 4. After high anxiety episodes, Dr. Whitfield testified that Caldwell "typically enters a major depressive episode." Whitfield Decl. ¶ 6, ECF No. 35-3 at 26. Although it is unclear exactly how long these depressive episodes last, Cadwell stated that they were "prolonged." Caldwell Decl. ¶ 4.

Dr. Whitfield explained that during flare-ups Caldwell's "capacities to think, concentrate and communicate are highly diminished" and that Caldwell "has great difficulty sleeping." Whitfield Decl. ¶ 7, ECF No. 35-3 at 26. According to Dr. Whitfield, Caldwell "has extreme difficulty accomplishing the most basic tasks, such as eating or getting out of bed," during major depressive episodes. *Id.* ¶ 8, ECF No. 35-3 at 26. Dr. Whitfield

concluded that these limitations "negatively impact[] [Caldwell's] ability to work to a considerable degree." *Id.* ¶ 7-8, ECF No. 35-3 at 26. Caldwell was hospitalized on two occasions due to flare-ups of her conditions in the year before she started working for ZÖe Center.

Regarding accommodation of her conditions, Dr. Whitfield testified that taking a day-long absence from work, or a "mental health day," can greatly assist Caldwell with managing flare-ups. *Id.* ¶ 9, ECF No. 35-3 at 26. Caldwell likewise testified that spending time at home with her prescribed emotional support animals helped mitigate flare-ups of her conditions in the past.

## II. Caldwell's Employment at ZÖe Center

From November 8, 2021, to January 21, 2022, Caldwell was an employee of ZÖe Center for Pediatric & Adolescent Health, LLC. ZÖe Center is a private pediatrics practice with multiple office locations in Georgia and Florida. ZÖe Center's founder and CEO is Dr. Stephanie Kong ("Dr. Kong"), who runs the business with her son, COO Freddie Kong ("Mr. Kong").

ZÖe Center hired Caldwell as a web designer. In that role, Caldwell's key responsibilities included managing all web design projects; serving as the primary client contact for ZÖe Center's websites and web-based services; writing, editing, designing, and updating content for ZÖe Center's websites; producing assets for use in ZÖe Center's social media and marketing channels; and

developing ZÖe Center's branding.    Caldwell Decl. Ex. E, Web Designer Job Description 3-4, ECF No. 35-3 at 55-56.    Caldwell performed well as a web designer.

### III. ZÖe Center's Attendance Policy

Dr. Kong testified that it was her "vision" that all ZÖe Center employees, including nonclinical workers, would perform their jobs in-person at ZÖe Center's offices during the COVID-19 pandemic.    Dr. Kong Dep. 150:10-16, 155:6-18, ECF No. 42.    Dr. Kong explained that this "blanket" policy of "all hands on deck" would ensure that she was not "under any undue hardship or stress about maintaining a work force" during the pandemic.    *Id.* at 158:1-14.    In addition, Dr. Kong testified that "a big part" of the motivation for ZÖe Center's in-office policy was her discomfort with the "security issues" she thought remote work entailed.    *Id.* at 213:7-25.

To that end, ZÖe Center's employee handbook provided the following: (1) unless "special arrangements" were made for an individual employee, every employee was expected to be "in the office" each day; (2) an employee who was unable to report for work was required to notify their supervisor; and (3) an employee who did not notify their supervisor before taking a day of absence from work would be considered a "N[o] C[all] N[o] S[how]" for that day.    Dr. Kong Dep. Ex. 4-B, ZÖe Center 2021 Employee Handbook 14,

28-29, ECF No. 42 at 318, 332-33.[1]  The employee handbook was ambiguous regarding the consequences of an employee no-call/no-show.  One section stated that if an employee did not report for work and ZÖe Center was not notified of the employee's status, ZÖe Center would "assume[]" that employee "resigned" after *one* no-call/no-show day of absence.  *Id.* at 14, ECF No. 42 at 318.  Another section provided that employees were subject to termination after incurring *two* no-call/no-show absences.  *Id.* at 29, ECF No. 42 at 333.  A separate section of the handbook entitled "ADA" provided that employees who "may require a reasonable accommodation [for a disability] should contact the Human Resources manager." *Id.* at 11-12, ECF No. 42 at 315-16.

Despite ZÖe Center's attendance policy, the company's former Director of IT Services Eddie Singleton testified that, sometime between the years 2017 and 2018, he set up a virtual private network which enabled ZÖe Center employees to work remotely. Singleton Dep. 57:11-58:5, ECF No. 40.  Singleton further testified that before the COVID-19 pandemic, ZÖe Center doctors performed some of their duties remotely from their homes, and that during the pandemic employees who tested positive for COVID were issued laptops so they could work from home.  *Id.* at 58:11-24, 128:8-19.

---

[1] Plaintiff's exhibits included ZÖe Center employee handbooks for the years 2021 and 2022.  No party disputes that both handbooks are identical with respect to ZÖe Center's attendance policy.

While working as web designer, Caldwell was given permission to work from home for two days when she was ill. Singleton, Caldwell's supervisor at the time, stated that there were no issues with Caldwell's performance on those days. *Id.* at 67:14-19.

**IV.  Caldwell's Promotion**

In December of 2021, Caldwell received a promotion to technical and media communications specialist, a position Dr. Kong created specifically for Caldwell with the intention of building out ZÖe Center's compliance team. This new role combined Caldwell's prior web designer responsibilities with new duties involving ZÖe Center's electronic records management platform, eClinicalWorks ("eCW"), which ZÖe Center uses to store and access patient health information. Dr. Kong testified that eCW was so integral to ZÖe Center's business that the company could not operate without it. Dr. Kong Dep. 212:16-19.

The communications specialist job description provided that Caldwell would "[m]aintain[] active knowledge of eCW platform capabilities and [] act as interface between Z[Ö]e Pediatrics and eCW;" "provide training on Z[Ö]e Pediatrics EMR platform, Ret[h]ink platform and related systems to all employees utilizing the EMR platform;" and support new or upgraded platform implementation modules, with implementation tasks including "testing in support environments, redesigning clinical workflows, facilitating end-user application trainings, and supporting go-

live activities." Dr. Kong Dep. Ex. 5, Communications Specialist Job Description 402-03, ECF No. 42 at 340-41. Dr. Kong testified that "one of [Caldwell's] main functions" as communications specialist was to "train people how to be proficient with eCW once she learned it," and that Caldwell would be a "troubleshooter" who would help "correct and roll out other work processes that would improve [ZÖe Center's] effectiveness." Dr. Kong Dep. 211:19-23, 217:15-22.

Following her promotion, Caldwell worked in the compliance department under her new supervisor Antoinette "Lucy" Chaney, ZÖe Center's then-Director of Platform Management. In that position, Chaney performed many functions related to eCW platform management, training, and support. Chaney testified that these duties required her to travel to ZÖe Center's offices approximately two to three times a week to "work physically" with employees on eCW training and troubleshooting at their computers. Chaney Dep. 66:7-18, 164:13-24, ECF No. 39. Dr. Kong testified that she intended for Caldwell to take on some of Chaney's job responsibilities to "lessen the burden" on Chaney. Dr. Kong Dep. 217:25-218:15.

Dr. Kong planned for Chaney to provide Caldwell with initial training on the eCW platform for three or four weeks, after which Dr. Kong would meet with Chaney and Caldwell once per week on an ongoing basis to discuss Caldwell's progress. *Id.* at 144:8-25.

Chaney testified that Caldwell would "shadow" her after the initial training period, also on an ongoing basis.  Chaney Dep. 162:23-163:24.  Caldwell, though, never began eCW training and thus never performed any job responsibilities related to that platform; the present record does not disclose why.  It is undisputed, however, that Chaney planned to train Caldwell on eCW after the promotion.

Throughout the next month in her role as communications specialist, Caldwell largely continued performing the same job tasks that she had as web designer, in addition to some work on digital marketing strategies.  Caldwell worked from home on two more occasions during this period: once for several hours due to illness, and once on a Sunday to complete the hours required for her 90-day employee probation period.  Caldwell Decl. Ex. H(1), Emails Between Caldwell and Chaney (Jan. 13-16, 2022), ECF No. 35-3 at 61-66; Caldwell Decl. Ex. H(2), Email from Caldwell to Chaney (Dec. 27, 2021), ECF No. 35-3 at 98-99.  Chaney did not recall encountering or hearing about any issues with Caldwell working remotely on those days.

## V.   Caldwell's Accommodation Request

On January 6, 2022, Caldwell began experiencing a flare-up of her mental health conditions, including a series of panic attacks that occurred with increasing frequency over the next two weeks. Caldwell's medical records reflect that she had a virtual visit with her healthcare provider on January 13, 2022.  Caldwell Decl.

Ex. C, Second Caldwell Medical Records, ECF No. 35-3 at 39-40.
The provider's notes for that visit reflect that Caldwell reported
"having more anxiety" that was "making [her] depression worse,"
and that it was "getting really hard" to manage her conditions.
*Id.*, ECF No. 35-3 at 40.

Twice in the late afternoon of January 20, Chaney visited
Caldwell's office to tell her that they would begin eCW training,
but Chaney did not see Caldwell in her office on either occasion.
Chaney Dep. 170:25-171:20, 175:1-9.  Chaney did not notify anyone
at ZÖe Center on January 20 that Caldwell appeared to be absent
from her office that day, and it is unclear when Chaney ever passed
on that information to anyone else.  *Id.* at 176:2-25.  Caldwell
asserts that she worked a full day from her office on January 20,
and she sent a series of work-related emails throughout that day.
Caldwell Decl. ¶ 26; Caldwell Decl. Ex. J,  Caldwell Work Emails,
ECF No. 35-3 at 102-10.

Later that evening, Caldwell sent an email to ZÖe Center's HR
Director Pursia Jackson.  Caldwell's email, entitled "Urgent
Request for Reasonable Accommodation," stated in relevant part:

> I would like to request alternative working options as
> a reasonable accommodation under the ADA.  As documented
> in my employee record, I have disabilities (if you need
> more details on this, I am happy to provide them) . . . .
>
> The accommodation I am requesting is (1) temporary full
> remote work (at least one full week), followed by (2) a
> hybrid remote/office schedule (ideally M/W/F remote,
> T/Th in office). . . . I am a more effective employee

10

> when able to work in a comforting environment, and having
> necessary interaction with my prescribed emotional
> support animal would be extremely helpful at this time.
> . . .
>
> If the proposed accommodation options are not possible,
> I would like to hear any alternative ideas you may have.
>
> If you have questions directly related to my condition,
> I am happy to answer them . . . . I'm willing to provide
> necessary documentation from my provider. . . .
>
> Please note that I will not be in the office tomorrow,
> as I am taking a desperately needed mental health day
> (if necessary, I can contact my provider for a note). I
> understand that the proper procedure for call-outs is to
> directly call my supervisor; however, I have been unable
> to reach her when I call, so I'm not sure what the next
> proper route is. I am absolutely willing to telework
> tomorrow . . . .

Caldwell Decl. Ex. K, Emails Concerning Accommodation Request 1 (Jan. 20-21, 2022), ECF No. 35-3 at 111 (hereinafter "January 20-21 Emails"). Prior to this email, Caldwell had not disclosed her disability to ZÖe Center: Caldwell testified that she mistakenly failed to include documentation evidencing her disability in her personnel file during the employee onboarding process. Caldwell Dep. I 103:13-104:7, ECF No. 46. At 8:15 p.m., Caldwell emailed Dr. Whitfield to request a letter supporting her accommodation request and authorizing her to send it directly to Jackson. Caldwell Decl. Ex. M, Caldwell Emails to Dr. Whitfield, ECF No. 35-3 at 120-21.

Jackson forwarded Caldwell's accommodation request email to Mr. Kong at 8:00 p.m. Jackson Dep. 116:3-6, ECF No. 38; January 20-21 Emails 2, ECF No. 35-3 at 112. Jackson then responded to

11

Caldwell's email at 8:15 p.m. with the following: "Get some rest and we will talk on Monday. Have a great weekend."  January 20-21 Emails 2, ECF No. 35-3 at 112.  Chaney testified that she never received contact from Caldwell regarding her planned absence from the office.  Chaney Dep. 201:1-6.

**VI.  Caldwell's Termination**

The next day, on January 21, Jackson shared Caldwell's email request for accommodation with Dr. Kong.  Dr. Kong testified that she was "perplexed" by the email, because she "didn't know [Caldwell] had a disability."  Dr. Kong Dep. 166:13-16.  Dr. Kong asked Jackson whether Caldwell provided any supporting documentation with her request.  *Id.* at 160:13-161:8.  When Jackson responded that Caldwell had not provided any documentation, Dr. Kong instructed Jackson to "tell [Caldwell] from me she can either show up at work or I'll accept her resignation if she can't show up at work."  *Id.*  Dr. Kong testified that she asked Chaney whether she could train Caldwell without Caldwell being on-site at ZÖe Center's offices, to which Chaney responded "No."  *Id.* at 165:20-25.  Dr. Kong also testified, however, that she "didn't ask any questions" regarding whether Caldwell could work remotely because she "already decided that wasn't going to happen."  *Id.* at 166:18-167:1.

At 1:25 p.m., Jackson emailed Caldwell and told her that she "went through [Caldwell's] file and did not see anything indicating

[Caldwell's] disability" and asked her to meet at one of ZÖe Center's Columbus offices. January 20-21 Emails 4, ECF No. 35-3 at 114. Caldwell sent an email in reply at 1:56 p.m., responding "I can head that way now." *Id.* at 4-5, ECF No. 35-3 at 114-15. Then, at 2:08 p.m., Dr. Kong sent an email to Jackson and Mr. Kong which stated the following: "Tell [Caldwell] you accept her resignation and keep on rolling. Delete all access. This is insubordination and a manipulator." *Id.* at 5, ECF No. 35-3 at 115.

Although Caldwell drove to ZÖe Center's office on January 21 in response to Jackson's email, no one was present to meet her when she arrived. Caldwell Decl. ¶ 34. Caldwell then contacted Jackson by phone, who informed her that she intended that they meet on the following Monday, January 24. *Id.* ¶ 35. During their phone call, Jackson asked Caldwell to provide medical documentation substantiating her claim of disability. Jackson Dep. 143:4-7. Jackson testified that Caldwell was unwilling to verbally disclose what her disability was or to provide any documentation. *Id.* at 138:18-139:5, 143:4-15. When Jackson responded that she needed the documentation to "fight" for Caldwell's accommodations, Caldwell stated she did not have the documentation and needed to meet with her physician to get it. *Id.* at 143:15-22.

After Caldwell returned home, she participated in another phone call, this time with Jackson and Mr. Kong. Caldwell Decl. ¶ 36. During that conversation, Jackson again asked Caldwell to provide medical documentation supporting her claim that she was disabled. Jackson Dep. 101:2-7. Jackson testified that Caldwell refused to provide documentation, citing privacy concerns. *Id.* at 101:8-9, 136:23-137:2. Mr. Kong then asked Caldwell whether she received approval from her supervisor to be absent from work on January 21, and Caldwell responded that she tried to reach out to her supervisor. Mr. Kong Dep. 143:22-144:1, ECF No. 43. Mr. Kong told Caldwell that "if she didn't come to work," ZÖe Center "would go ahead and accept her resignation." *Id.* at 144:2-4. When Caldwell refused to resign, Mr. Kong told her she was terminated. *Id.* at 144:4-9.

Dr. Kong testified that she made the decision to terminate Caldwell for being a "no-call/no-show," and Mr. Kong testified that he merely delivered Dr. Kong's decision. Dr. Kong Dep. 165:8-16; Mr. Kong Dep. 119:12-16, 146:23-147:1. Mr. Kong also testified that Dr. Kong gave him authority to allow Caldwell to come back to work on January 21, and that Caldwell would have been granted an accommodation had she agreed to provide medical documentation substantiating her claim of disability. Mr. Kong Dep. 147:2-11, 106:17-20. Dr. Kong testified, however, that she would not have changed her decision to terminate Caldwell even if Caldwell

14

provided medical documentation showing she was disabled. Dr. Kong Dep. 199:11-14.

In considering Caldwell's accommodation request, Chaney stated that she "d[idn't] know" whether she could have trained Caldwell on the eCW platform remotely. Chaney Dep. 163:25-164:8. Chaney explained that training involved working "one on one," and that it would have been "really hard" to train Caldwell if she was not able to travel with Chaney to ZÖe Center's offices. *Id.* at 159:11-15, 164:5-7. Chaney further testified that she did not have the eCW platform set up on Caldwell's laptop and that, at least during Caldwell's employment, she did not have the capability to remotely access employee computers. *Id.* at 78:24-80:16, 211:6-10. Although Caldwell responded "yes" when asked whether she could have trained Caldwell if Caldwell was in the office two days per week, Chaney further explained that, even after the initial training period, Caldwell would not be prepared to train other employees on eCW or handle "big task[s]" that didn't require Chaney "to be right there beside" Caldwell. *Id.* at 164:9-167:3. For his part, former IT-Director Singleton testified that he trained employees on "aspects" of eCW remotely and that "it went just fine." Singleton Dep. 87:19-24.

Nevertheless, Dr. Kong testified that she would not have "changed [her] mind" and granted Caldwell's accommodation request even if Chaney affirmed that she could train Caldwell remotely.

Dr. Kong Dep. 167:7-10.  When asked whether there was any reason Caldwell could not have performed her eCW responsibilities remotely, Dr. Kong replied, "My vision, my company."  *Id.* at 151:18-24.  When asked if there were any additional reasons besides her "vision," Dr. Kong responded, "There doesn't have to be," and "No."  *Id.* at 151:25-152:4.

## VII. Events After Caldwell's Termination

In November of 2022, Chaney emailed Dr. Kong to request a remote work accommodation.  Mr. Kong Dep. Ex. 4, Emails (Nov. 18, 2022) 497-98, ECF No. 43 at 244-45.  Chaney explained that she was under doctor's orders not to drive due to treatment for an underlying medical condition and needed accommodation until her doctor released that restriction.  *Id.*  Dr. Kong sent an email in response, stating that she "d[idn't] have a problem with" Chaney working remotely and that Chaney could "train remotely if necessary."  *Id.* at 497, ECF No. 43 at 244.  Chaney subsequently emailed Jackson and agreed to provide medical documentation for her accommodation request, though it is unclear whether that documentation was ever received.  *Id.* at 495-96, ECF No. 43 at 242-43.  Chaney explained that although "a lot of assignments piled on," she didn't experience any issues working from home.  *Id.* at 130:20-23.  Even so, Chaney testified that Dr. Kong revoked her remote-work accommodation without explanation after approximately one and a half weeks.  *Id.* at 129:18-20, 130:16-19.

ZÖe Center began hiring remote billers in late 2022.  Dr. Kong Dep. 64:18-23.  Employees located outside of the state were issued laptops so they could do billing work.  Singleton Dep. 115:9-14.  Dr. Kong explained that the billers were trained remotely on how to "process claims through eCW," and that ZÖe Center trained billers through Zoom "all the time."  Dr. Kong Dep. 66:11-25, 68:15-18.  Dr. Kong also testified that it was "hard" to train billers remotely because training requires sitting "in tandem" with the billers to explain the billing system, and the trainer cannot "take over the navigation" of the biller's computer to teach them "when they get stuck," as is possible with in-person training.  *Id.* at 66:11-25, 67:16-68:25.

After Caldwell's termination, ZÖe Center hired a third-party contractor, WXTX.com, to perform marketing services as well as manage, maintain, and update ZÖe Center's website.  The third-party contractor worked offsite during the term of the contract. Then, in October of 2023, ZÖe Center hired Dr. Kong's nephew, Jason Jenkins, for the position of web designer.  Jenkins' job description lists many of the same duties that Caldwell performed in that role and continued to perform after her promotion to communications specialist.  Pl.'s Mot. Partial Summ. J. Ex. 2, Jason Jenkins Personnel File 461-62, ECF No. 35-7.  Dr. Kong testified that Jenkins also performs a "call" or "help desk" function, through which he offers technical assistance over the

phone and can remotely access other computers.  Dr. Kong Dep. 77:14-20.  Jenkins is permitted to work remotely three weeks per month.  It is unclear whether Jenkins performs any responsibilities related to eCW.

## DISCUSSION

Under Title I of the ADA, employers shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination on the basis of disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so "would pose an undue hardship" on the employer.  *Id.* § 12112(b)(5)(A).  The EEOC asserts that Caldwell is a qualified individual and that ZÖe Center discriminated against her because of her mental health conditions by denying her request for accommodation and terminating her employment.  The EEOC contends that there are no genuine fact disputes on these issues and that it is entitled to summary judgment on these elements of its claims.  ZÖe Center argues that genuine fact disputes exist on (1) whether Caldwell has a disability, (2) whether Caldwell was a qualified individual during her employment with ZÖe Center, and

(3) whether Caldwell requested a reasonable accommodation from ZÖe Center.  The Court addresses each issue in turn.

## I.    Did Caldwell Have a Disability?

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  Major life activities include "caring for oneself . . . eating, sleeping, . . . concentrating, thinking, communicating, and working" as well as "the operation of a major bodily function," including "brain . . . function[]."  *Id.* § 12102(2).  Whether an individual is substantially limited in a major life activity is judged in comparison to "most people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).  ZÖe Center does not dispute that Caldwell has several mental impairments.  Rather, ZÖe Center argues that Caldwell's impairments did not substantially limit any of her major life activities.

"Congress amended the ADA by enacting the ADA Amendments Act of 2008 (the 'ADAAA') with the goal of broadening the interpretation of a disability under the ADA."  *Lewis v. City of Union City*, 934 F.3d 1169, 1180 (11th Cir. 2019).  Consequently, the statute now instructs that the definition of disability "shall be construed in favor of broad coverage of individuals" and that "[a]n impairment that is episodic . . . is a disability if it would substantially limit a major life activity when active."  42 U.S.C.

§ 12102(4)(A), (D).  "These amendments convey that an extensive analysis is not required to determine whether an individual's impairment is a disability under the ADA."  *EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016).

In explaining the definition of disability under the ADA, the EEOC's regulations state that the "substantially limits" standard is not meant to be a "demanding" one.  29 C.F.R. § 1630.2(j)(1)(i). The regulations accordingly provide that some types of physical and mental impairments "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity" and that the assessment of such impairments "should be particularly simple and straightforward."  *Id.* § 1630.2(j)(3)(ii). For example, "it should easily be concluded" that certain mental impairments, including "major depressive disorder" and "post-traumatic stress disorder" will "substantially limit brain function."  *Id.* § 1630.2(j)(3)(iii); *see also Mastaw v. W. Fla. Med. Ctr. Clinic, PA*, No. 22-12202, 2023 WL 5426757, at *3 (11th Cir. Aug. 23, 2023) (per curiam) (citing 29 C.F.R. § 1630.2(j)(3)(iii) to conclude that "[p]ost-traumatic stress disorder is a disability under the ADA").

Here, the EEOC presented evidence that Dr. Whitfield, Caldwell's primary mental healthcare provider, diagnosed Caldwell with four mental impairments: PTSD, major depressive disorder, generalized anxiety disorder, and ADHD.  The EEOC also presented

declarations from Caldwell and Dr. Whitfield describing the
limitations Caldwell experiences during "flare-ups" of those
impairments, including extreme difficulty accomplishing the most
basic tasks like eating and getting out of bed. Finally, the EEOC
submitted medical records showing the treatment Caldwell received
for her conditions beginning in 2020, including her visits with
healthcare professionals, her list of prescribed medications, and
her two hospitalizations following "flare-ups" of her conditions.
*See generally* Caldwell Decl. Ex. A, First Caldwell Medical Records,
ECF No. 35-3 at 15-23; Caldwell Decl. Ex. C, Second Caldwell
Medical Records, ECF No. 35-3 at 28-54.

ZÖe Center argues that Caldwell does not have a disability
because her impairments were not obvious to her coworkers, she
performed well as an employee, and she did not disclose her
disabilities to ZÖe Center until she sent her email request for
accommodation. But ZÖe Center does not dispute that the EEOC
presented medical evidence explaining Caldwell's diagnoses and how
those conditions affect her during "flare-ups." ZÖe Center
asserts, though, that it "disputes" the EEOC's medical evidence
because ZÖe Center is "without knowledge" as to its accuracy.
Def.'s Resp. to Pl.'s Statement of Material Facts ¶¶ 1-6, ECF No.
50-6. Under Federal Rule of Civil Procedure 56(c)(1)(A), a party
asserting that a genuine fact is disputed "must support the
assertion by . . . citing to particular parts of materials in the

record."  A party's mere lack of knowledge does not create a genuine dispute of material fact, and ZŌe Center did not establish that it was unable to discover facts essential to its opposition.

The EEOC's medical evidence thus stands unrebutted.  It establishes, at a minimum, that Caldwell had mental impairments of PTSD and major depressive disorder and that those impairments substantially limited Caldwell's brain function as compared to most people in the general population.  *See* 29 C.F.R. 1630.2(j)(3)(iii) ("[I]t should easily be concluded" that "major depressive disorder" and "post-traumatic stress disorder" will substantially limit "brain function.").  For these reasons, the Court finds that the EEOC established, as a matter of law, that Caldwell had a "disability" within the meaning of the ADA.  The EEOC's motion for summary judgment on that issue is granted.

## II.  Was Caldwell a Qualified Individual?

The next question for the Court is whether Caldwell was a "qualified individual" with a disability.  *See* 42 U.S.C. § 12112(a) (protecting only "qualified individual[s]" from disability discrimination in employment).  Under the ADA, a "qualified individual" is an individual with a disability "who, with or without reasonable accommodation, can perform the essential functions of" her job.  *Id.* § 12111(8).  "If the individual is unable to perform an essential function of [her] job, even with an accommodation, [s]he is, by definition, not a 'qualified

22

individual' and, therefore, not covered under the ADA." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007) (quoting *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005)). Although Caldwell never undertook most of the additional responsibilities assigned to her upon her promotion to communications specialist, the parties agree that Caldwell would have performed those tasks in the near future had she not been terminated. Therefore, those functions are considered in the Court's qualified individual analysis. *See Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) ("The ADA covers people who can perform the essential functions of their jobs presently *or in the immediate future*.") (emphasis added).

For the reasons discussed below, the Court finds that a genuine fact dispute exists regarding whether Caldwell is a qualified individual because ZŌe Center pointed to evidence from which a jury could conclude that Caldwell's job responsibilities required her in-person presence and thus could not have been performed remotely.

"[E]ssential functions" are "the fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). The ADA directs courts to consider the

employer's judgment about the essential functions of a position, including the written job description.  42 U.S.C. § 12111(8). Courts may also consider the testimony of an employee's supervisor in determining whether a function is essential.  *Holly*, 492 F.3d at 1257.

The job description for communications specialist stated that Caldwell would, among other things, "[m]aintain[] active knowledge of eCW platform capabilities and [] act as interface between Z[Ö]e Pediatrics and eCW."  Dr. Kong Dep. Ex. 5, Communications Specialist Job Description 402-03, ECF No. 42 at 340-41.  Dr. Kong, who crafted the communications specialist job specifically for Caldwell, testified that one of Caldwell's "main functions" in that role would be to train other ZÖe Center employees on eCW once she became proficient on the platform.  Dr. Kong Dep. 217:15-22. Dr. Kong also testified that Caldwell would ultimately take over some responsibilities from her supervisor, Chaney, who also worked with eCW.  Chaney testified that her job required her to travel to ZÖe Center's offices several times a week to offer employees in-person assistance with eCW training and troubleshooting.  Chaney further testified that she would provide Caldwell with initial eCW training over approximately two weeks, after which Caldwell would "shadow" her on an "ongoing" basis.  Chaney Dep. 162:1-163:24.

A jury could conclude from the above testimony that Caldwell's in-person presence was an essential function of her job as

communications specialist.  Viewed in the light most favorable to ZÖe Center, the evidence shows that Caldwell would learn how to operate the eCW platform by shadowing Chaney on an ongoing basis, and that such training would occur while Chaney was traveling to ZÖe Center's offices throughout each week.  Thereafter, Caldwell would act "as interface" between eCW and ZÖe Center and, in acquiring Chaney's responsibilities, assist ZÖe Center's employees at their computers for training and troubleshooting purposes.  A jury could therefore find that Caldwell's eCW training, and thereafter her training and support of other employees using that platform, required her to be physically present in ZÖe Center's offices.[2]  Based on this genuine fact dispute, the EEOC is not entitled to summary judgment on the "qualified individual" element of its claims.

Because there are genuine fact disputes on whether in-person attendance was an essential element of Caldwell's job, the EEOC is also not entitled to summary judgment on its assertion that Caldwell requested a reasonable accommodation when she asked to work remotely from time to time.  "An accommodation is 'reasonable' and necessary under the ADA . . . only if it enables the employee to perform the essential functions of the job."  *Holly*, 492 F.3d

---

[2] This is not the only conclusion that a jury could reach.  The EEOC presented evidence from which a reasonable juror could conclude that it was possible to do the eCW training remotely and that such training did not require daily in-person presence at the office.

at 1256.  A reasonable accommodation may include, among other things, a "modified work schedule[]." 42 U.S.C. § 12111(9)(B).  As Plaintiff, the EEOC "bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [Caldwell] to perform [her] job's essential functions." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001).

The EEOC argues that Caldwell could have performed her responsibilities related to eCW while working from home, because Chaney answered "yes" when asked whether she could have trained Caldwell on that platform if Caldwell was in the office only two days a week.  Chaney Dep. 163:25-164:11.  But Chaney also testified that, even after Caldwell's initial training period, Caldwell would not be able to train other employees on eCW or handle "big task[s]" that didn't require Chaney "to be right there beside" Caldwell.  *Id.* at 164:9-167:3.  Therefore, genuine fact disputes exist on whether Caldwell could have performed the essential functions of her position—namely, her eCW training and later support of other employees using that platform—if she worked from home.  *See Ryerson v. Jefferson Cnty. Comm'n*, No. 20-14684, 2021 WL 3629906, at *2 (11th Cir. Aug. 17, 2021) (per curiam) ("Although a modified work schedule may be a reasonable accommodation in some circumstances, the ADA does not require an employer to eliminate an essential function of a job in order to accommodate a disabled employee.").  Genuine fact disputes also exist on whether allowing

Caldwell to work remotely would have created an undue burden in the form of security and technical problems. Based on these genuine fact disputes, the EEOC is not entitled to summary judgment on its assertion that Caldwell requested a reasonable accommodation when she asked to work remotely.

CONCLUSION

For the reasons set forth above, the Court grants the EEOC's partial summary judgment motion (ECF No. 35) on the issue of whether Caldwell had a disability within the meaning of the ADA: she did. As to the remaining elements of the EEOC's claims, including whether Caldwell was a "qualified individual" who requested a reasonable accommodation, the Court finds that genuine fact disputes preclude summary judgment on these issues. This action will be tried during the Court's September 2025 trial term.

IT IS SO ORDERED, this 27th day of June, 2025.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA